S/N/I

NO FEE

CLERK, U.S. DISTRICT COURT

SEP 26 2017

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

1  Thomas Simek, *pro hac vice pending*
   *tsimek@cftc.gov*
2  James M. Humphrey IV, *pro hac vice pending*
   *jhumphrey@cftc.gov*
3  Attorneys for Plaintiff
   COMMODITY FUTURES
4  TRADING COMMISSION
   4900 Main Street, Suite 500
5  Kansas City, MO  64112
   (816) 960-7700
6

FILED
CLERK, U.S. DISTRICT COURT

OCT 2 2017

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

7  Local Counsel:
   Kent A. Kawakami, CA Bar # 149803
8  *kent.kawakami@usdoj.gov*
   United States Attorney's Office
9  Central District of California
   300 N. Los Angeles Street, Room 7516
10 Los Angeles, CA 90012
   (213) 894-4858
11

12

13          **IN THE UNITED STATES DISTRICT COURT**
            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
14                    **WESTERN DIVISION**

15

16 COMMODITY FUTURES TRADING       Civil Action No. **2:17-CV-07102-CBM-JPRx**
   COMMISSION,
17

18        Plaintiff,                **COMPLAINT FOR INJUNCTIVE**
                                     **AND OTHER EQUITABLE RELIEF**
19 v.                               **AND FOR CIVIL MONETARY**
                                     **PENALTIES UNDER THE**
20                                   **COMMODITY EXCHANGE ACT**
   SCOTT ALLENSWORTH, individually  **AND COMMISSION REGULATIONS**
21 and d/b/a CAPITAL GROWTH GROUP
   ASSOCIATES AND COBRA
22 DEVELOPMENT GROUP LLP,
   ROBERT J. FUSCO, DAVID WEDDLE,
23 and E-SLATE, INC. d/b/a/ COBRA
   DEVELOPMENT GROUP LLP,
24

25        Defendants.

26

27

28

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), an independent federal regulatory agency, alleges as follows:

## I.     INTRODUCTION

1.     From at least December 2013 to the present ("Relevant Period"), Scott Allensworth ("Allensworth") fraudulently solicited certain of his tax and retirement-planning clients to contribute to commodity pools for the purpose of trading in commodity futures.  Allensworth himself did not trade commodity futures.  Rather, he first convinced his clients to invest, through Allensworth's own companies, with supposed successful commodity futures trader Robert J. Fusco ("Fusco").  Those funds were pooled in Fusco's company DTG LLC ("the DTG Pool").  Fusco and DTG, however, did not transfer any funds to any commodity futures trading account or trade any commodity futures.  As such, no commodity futures trading occurred on behalf of the DTG Pool participants.  Instead, Fusco misappropriated DTG Pool participant funds to allegedly pay a personal tax lien.  Allensworth also received DTG Pool participant funds from Fusco.  Allensworth concealed (and continues to conceal) this misappropriation from his clients.

2.     After being unable to withdraw his clients' funds from Fusco, Allensworth fostered a relationship with replacement commodity futures trader David Weddle ("Weddle") and directed millions of dollars to a commodity pool operated by Weddle, JustInfo LLC ("the JustInfo Pool"), for the purpose of trading commodity futures.

3.     To solicit pool participants in the JustInfo Pool, Allensworth and Weddle worked together, touting exorbitantly high but false commodity futures trading returns.  To maintain a stream of new pool participants from Allensworth and prevent the existing pool participants from fleeing, Weddle fabricated trading statements showing the exorbitant returns and provided them to Allensworth, existing pool participants, and prospective pool participants.  Allensworth also used these fabricated trading statements to solicit additional investments from existing and prospective pool

participants.

4.     In reality, Weddle was an abysmal futures trader, losing all of the JustInfo Pool funds that he traded, and misappropriating the remainder for his personal use. Weddle and Allensworth also perpetuated the scheme by using new pool participant funds to repay existing pool participants, in the nature of a Ponzi scheme. Combined, activity in the DTG Pool and JustInfo Pool resulted in total losses of $2,743,692.29 to at least seventy pool participants.

5.     By engaging in this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in violations of anti-fraud and registration provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012), and Commission Regulations ("Regulations"), 17 C.F.R. pt. 1-190 (2017). Specifically, Defendants violated the anti-fraud provisions contained in Sections 4b(a)(1)(A)-(C) and 4o(1)(A) and(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o(1)(A),(B) (2012). In addition, Defendants violated registration requirements set forth in Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2012); Allensworth and E-Slate violated registration requirements set forth in Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2017); and Weddle and Fusco violated registration requirements set forth in Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012). Finally, Weddle and Fusco engaged in activities prohibited by Regulation 4.20(b) and (c), 17 C.F.R. § 4.20(b), (c) (2017).

6.     Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this complaint or in similar acts and practices, and funds they have obtained fraudulently may be misappropriated or otherwise dissipated. Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act. The CFTC also seeks civil monetary penalties and remedial ancillary relief, including restitution, disgorgement, pre- and post-judgment interest, and such other equitable relief as this Court may deem necessary and appropriate.

## II.   JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

8.     Venue lies properly in this District pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants transacted business in this District, and certain of the acts and practices in violation of the Act and Regulations occurred, are occurring, or are about to occur within this District, among other places.

## III.   PARTIES

9.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations.

10.    Defendant **Scott Allensworth** is an individual who resides in Newhall, California.  Allensworth held himself out at various times as the "CEO" and/or "COO" of Capital Growth Group Associates ("CGGA"), Cobra Development Group LLP, ("Cobra"), and E-Slate, Inc. ("E-Slate").  During the Relevant Period, Allensworth has been doing business as CGGA and has held E-Slate out as doing business as Cobra.  Although represented to be an LLP, Cobra is actually a d/b/a for Allensworth and E-Slate.  Allensworth describes himself as and acts as an investment, tax, options, and retirement advisor.  Allensworth also holds a 2% ownership interest in Weddle's company JustInfo LLC.  Allensworth, CGGA, and Cobra have never been registered with the Commission in any capacity.

11.    Defendant **E-Slate Inc.** is a California corporation organized in December

2012, with its principal place of business located in Valencia, California.  Allensworth used E-Slate in connection with his business operations, including using a bank account held in E-Slate's name to funnel pool participant funds to both Fusco and Weddle.  Pool participant funds were made payable to E-Slate.  E-Slate has never been registered with the Commission in any capacity.

12.     Defendant **Robert J. Fusco** is an individual who resides in Henderson, Nevada.  Fusco served as the commodity futures trader in the Allensworth/Fusco scheme.  Fusco established and operated DTG LLC. Fusco has never been registered with the Commission in any capacity.

13.     Defendant **David Weddle** is an individual who resides in Somerset, Kentucky.  Weddle has worked as, among other things, a music teacher, an account manager selling computer equipment and software, a consultant, and a commodity futures trader.   Weddle served as the commodity futures trader in the Allensworth/Weddle scheme.   Weddle established and operated JustInfo LLC.  Weddle has never been registered with the Commission in any capacity.

### IV.     OTHER RELEVANT ENTITIES

14.     **DTG LLC** is a limited liability company organized in Nevada in August 2014, with its principal place of business at 425 E. Silverado Ranch Blvd., Unit 285, Las Vegas, NV 89183.  Fusco used DTG LLC as part of the Allensworth/Fusco scheme by fraudulently soliciting pool participants and using it to accept pool participant funds for the purported purpose of trading commodity futures.   Pool participant funds were transferred from Allenworth/E-Slate to a bank account held by DTG LLC and controlled by Fusco.  Fusco then used the DTG LLC bank account to misappropriate for his own use all of the pool participants' funds.  DTG LLC has never been registered with the Commission in any capacity.

15.     **JustInfo LLC** is a limited liability company established by Weddle as a Kentucky LLC in December 2009, with its principal place of business at 3404 Woodhaven Drive, Somerset, KY 42503.  In 2015, Weddle started using JustInfo LLC

to trade commodity futures.   Weddle used JustInfo LLC to carry out the Allensworth/Weddle scheme by fraudulently soliciting pool participants and using it to accept pool participant funds for the purported purpose of trading commodity futures. JustInfo LLC is also the name found on Allensworth's and Weddle's fabricated trading account statements and the name on one of three commodity futures trading accounts holding pool participant funds.   In addition, JustInfo LLC was the name on the bank account that served as the primary conduit for fraudulently soliciting pool participant funds.  JustInfo LLC has never been registered with the Commission in any capacity.

## V.   FACTS

16.   To execute the fraudulent schemes, Allensworth, individually and doing business as CGGA and Cobra, and as an agent and principal of E-Slate, solicited his existing tax, retirement, and investment clients, along with their family, friends, and acquaintances, to contribute to two separate commodity pools, JustInfo and DTG, for the purpose of trading in commodity futures.

### A.   Allensworth/Fusco Scheme and the DTG Pool

17.   In 2013, Allensworth learned of Fusco through a radio show touting Fusco's prowess as a commodity futures trader.   By at least December 2013, Allensworth began soliciting his existing clientele to invest in commodity futures through Cobra and E-Slate, with Fusco as the affiliated commodity futures trader. Allensworth represented to his clients that he had a relationship with Fusco, a purportedly successful futures trader based in Las Vegas, Nevada.   Allensworth represented in writing to some prospective pool participants that Cobra and E-Slate would "apply a conservative approach….never put more than 3% at risk" and that pool participants could get their "money out at any time."   Allensworth further represented that all pool participant funds would be invested in commodity futures, with Fusco managing trading.   Allensworth persuaded thirteen pool participants to contribute $246,500 to the DTG Pool.

18.   Once pool participants invested in the DTG Pool, Fusco produced trading

statements to Allensworth who, in turn, produced such to the pool participants. These trading statements were nothing more than cut and pasted numbers from an excel spreadsheet created by Fusco. The fabricated trading statements showed exorbitantly high returns on the pool participants' initial investments. The returns were false. Fusco never traded commodity futures on behalf of the pool participants. Allensworth touted these returns in order to procure further investments. Allensworth should have but never did any independent investigation into the accuracy of the allegedly profitable commodity futures trading for the DTG Pool.

19. To invest in the DTG Pool, Allensworth typically directed prospective pool participants to write checks to a bank account in E-Slate's name. From this account, Allensworth wired $217,000 to Fusco's DTG bank account. Allensworth wrote a personal check for $20,000 on his parents' bank account to Fusco's DTG bank account. Allensworth also received $10,000 in the CGGA bank account and then transferred $9,500 of it to Fusco. All told, Allensworth directed $246,500 to Fusco. Allensworth received nearly $30,000 from Fusco, presumably as commission payments.

20. During the Relevant Period, neither Fusco nor DTG ever transferred any funds to any commodity futures trading account or traded any commodity futures. No commodity futures trading occurred on behalf of the pool participants. Instead, all of the funds were misappropriated by Allensworth and Fusco.

21. Allensworth comingled pool participant funds with his own personal funds in the E-Slate and CGGA bank accounts and paid personal expenses from both accounts.

22. Fusco commingled the pool participant funds with his own funds in the DTG bank account. Fusco frequently withdrew pool participant funds from ATMs inside, or in close proximity to, casinos. Fusco misappropriated all pool participant funds from the DTG account.

23. When pool participants requested withdrawals, Fusco and Allensworth

1  routinely failed and refused to provide the requested funds, instead proffering a litany
2  of excuses.

3      24.   When Allensworth confronted Fusco about his failure to return funds to
4  pool participants, Fusco informed Allensworth that he had misappropriated the funds
5  to pay a personal tax lien.  In total, Fusco misappropriated approximately $217,000,
6  and Allensworth misappropriated approximately $29,000 from DTG pool participants.

7      25.   Allensworth is actively concealing his and Fusco's misappropriation from
8  his clients.  Moreover, Fusco and Allensworth continue to misrepresent to pool
9  participants that significant profits exist in the DTG Pool.  In reality, all or almost all
10  of the pool participant funds have been misappropriated.

11      **B.**    **Allensworth/Weddle Scheme and the JustInfo Pool**

12      *1.*    *Weddle Forms the JustInfo Pool To Trade Commodity Futures*

13      26.   In the second half of 2015, Weddle solicited and accepted funds from a
14  small group of friends to form an "investment club" to trade commodity futures.  This
15  investment club was organized as JustInfo.  In September and October 2015, Weddle
16  accepted checks for $5,000 from four pool participants and deposited the $20,000 into
17  JustInfo's bank account at First Southern National Bank.  This was the start of the
18  JustInfo Pool.

19      27.   Weddle transferred a portion of these funds to his already existing
20  personal futures trading account at a registered Futures Commission Merchant
21  ("FCM"), where he commingled pool participant funds with his own personal trading
22  funds.  He misappropriated the remainder of the initial pool participant funds for his
23  personal use.

24      28.   From the outset, Weddle was an abysmal futures trader, losing over
25  $50,000 of his own and pool participant funds trading from October to December
26  2015.  Weddle did not disclose these losses to the initial pool participants.  Instead,
27  Weddle produced completely fabricated statements to the pool participants showing
28  that the JustInfo Pool was highly profitable.

2.     *Allensworth Begins Soliciting His Clients To Invest in the JustInfo Pool*

29.     Allensworth and Weddle became acquainted in the 1980s when both were living in California and Allensworth provided tax planning services to Weddle.  Their relationship continued even after Weddle moved from California to Kentucky in 2008.  In 2015, Allensworth spoke with Weddle about the possibility of Weddle trading commodity futures on behalf of Allensworth's clients.

30.     In November 2015, shortly after the Justinfo Pool was formed by Weddle, Allensworth invested $25,000 of his mother's money and began soliciting his clients to invest in the JustInfo Pool.

31.     To assist Allensworth's solicitations, Weddle provided to Allensworth fabricated statements showing that the JustInfo Pool was highly profitable, often showing trading profits of more than 20% per month.

32.     To convince his clients to invest in the JustInfo Pool, Allensworth touted Weddle's fantastically high commodity futures trading returns, often showing prospective pool participants the fabricated statements provided by Weddle.  Allensworth also represented that Weddle was a successful commodity futures trader with a long history of profitable trading and, at times, guaranteed to prospective pool participants a 15% monthly return.

33.     Further, to solicit new pool participants in the JustInfo Pool and additional investments from existing pool participants, Allensworth and Weddle sent misleading emails and texts touting profitable trades but ignoring much larger losses.

34.     For example, a number of pool participants received a February 17, 2016 email from Allensworth attaching a Daily Trading Report and describing "[o]nce again, nice & obscene profits for the day !!!"  A similar email dated August 16, 2016 reported daily trading results of "+0.75 Points !! 2 Trades !!  Profits !! . . . Still on target for an +18.0 point month !!"  While Weddle did have profitable trades on these days, overall he lost approximately $58,000 in February 2016 and approximately

$129,000 in August 2016 trading commodity futures on behalf of the JustInfo Pool.

35.    In addition to daily reports, numerous JustInfo pool participants received periodic "update" emails from Allensworth.  These "update" emails describe "obscene profits" and average "20% per month net returns."   The "update" emails also encouraged pool participants to increase their investment to produce "a larger & faster increase in your account."  At the same time, the "update" emails told pool participants to "rest assured" because their "account & funds are still in our 'protected cocoon . . . .'"  These "update" emails were completely false.  Weddle never had a profitable month trading commodity futures, much less averaged 20% monthly net returns on behalf of the JustInfo Pool.

36.    Allensworth should have but never did any independent investigation into the accuracy of the purportedly highly profitable commodity futures trading in the JustInfo Pool.

37.    As a result of his solicitations, fifty-nine of Allensworth's clients invested approximately $2.7 million in the JustInfo Pool.

        *3.    After Agreeing To Invest, JustInfo Pool Participants Enter into an*
           *Investment Agreement*

38.    Allensworth and Weddle required some or all pool participants in the JustInfo Pool to enter into an "Investment Agreement" with CGGA.  The "Investment Agreement" identified the amount invested, stated that it would be "placed in a brokerage account," and discussed when the trading would begin.   Allensworth executed the "Investment Agreements" as "Business Principal" of CGGA.  In some instances, pool participants also executed documents that identified their investment as being placed in a "Just Info Trading account" or "Just Info, LLC, and/or its affiliates, [CGGA], [FCM] Trading Accounts."

39.    To invest in the JustInfo Pool, Allensworth typically instructed prospective pool participants to pay funds to CGGA.  On at least one occasion, a pool participant wired funds directly to JustInfo.  Allensworth commingled pool participant

funds with his own funds in the CGGA bank account.  Weddle commingled pool participant funds in both the JustInfo bank account and the FCM commodity futures trading accounts.

### 4. Pool Participant Funds Are Lost in Trading and Misappropriated by Weddle and Allensworth

40.    Weddle deposited approximately $1.7 million of the approximately $2.5 million pool participant funds that he received either directly or by and through Allensworth into commodity futures trading accounts.  Allensworth also received approximately $400,000 from pool participants that he never sent to Weddle or DTG for commodity futures trading.  In total, the Allensworth/Weddle scheme took in approximately $2.9 million in pool participant funds.

41.    Of the approximately $1.7 million Weddle deposited into commodity futures trading accounts, only $91,500 was deposited into a commodity futures trading account in the name of the JustInfo Pool.  This account was not opened until March 2016.  The remainder was deposited into Weddle's personal trading accounts at the FCM.  By March 2017, Weddle had lost the entire $1.7 million trading commodity futures, never having a winning month.

42.    The remaining approximately $1.2 million invested by pool participants was misappropriated by Weddle and Allensworth or were Ponzi payments to pool participants. Weddle misappropriated for his own use approximately $500,000 of the pool participant funds.  He used these funds for, among other things, vacations, golf country club dues, mortgage payments, groceries, dining, spa treatments, and college tuition for his children.  Allensworth received approximately $300,000 back from Weddle, and he used, at least, some of these funds for personal purposes.  Only approximately $400,000 of the funds received by Allensworth and Weddle were returned to pool participants as either redemptions or purported profits.

### 5. The Allensworth/Weddle Scheme Falls Apart

43.    Weddle represented to the FCM when he opened his trading accounts that

he was only trading his own funds.  In addition, in response to another FCM inquiry in June 2016, Weddle again represented that he was exclusively trading his own funds as part of his hobby of trading.  While making these representations, Weddle, working with Allensworth, was actively soliciting funds from additional pool participants.

44.    In early 2017, a JustInfo pool participant contacted the FCM after requesting the return of her $20,000 initial investment from Allensworth.  Because she had not received her funds as requested, she inquired about the amount of time needed to fulfill such a request.  In doing so, she referred to Weddle as her "[b]roker[.]"  In follow up with Allensworth over her refund request, Allensworth represented to her that the FCM was conducting an audit that was preventing the return of her requested funds.  This was false.

45.    Other JustInfo pool participants made repeated demands for the return of their funds.  In an effort to address these demands, Weddle fabricated an email communication announcing a "Compliance Review" of the FCM trading accounts at issue and a resulting hold on "withdrawals from these accounts . . . ."

46.    In April 2017, Allensworth forwarded a "Disbursement of Funds Update" email from Weddle to pool participants.  The email reported that there were "no funds to be distributed from any of the three [FCM] trading accounts.  They were liquidated . . . in an amount less than $10,000.00 . . . ."

## VI.    VIOLATIONS OF THE ACT AND REGULATIONS

### COUNT I—AGAINST ALL DEFENDANTS

**FRAUD IN CONNECTION WITH COMMODITY FUTURES CONTRACTS**

**Violations of Section 4b(a)(1)(A)-(C) of the Act**

47.    The allegations in paragraphs 1-46 are re-alleged and incorporated herein by reference.

48.    Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C) (2012), makes it unlawful:

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .

. . . .

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

49.     As described herein, Defendants violated Section 4b(a)(1)(A)-(C) of the Act by, among other things:  (i) fraudulently soliciting pool participants and prospective pool participants by making material misrepresentations and omissions about Defendants' commodity futures trading strategy, Defendants' trading abilities and profits, and Defendants' use of deposited funds; (ii) misappropriating pool participants' funds; and (iii) fabricating false records in the form of fake pool performance statements and fake individual account statements.

50.     Defendants engaged in the acts and practices described above willfully (knowingly or recklessly).

51.     Defendants engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to:  interstate wires

for transfer of funds, emails, websites, and other electronic communication devices.

52.     Allensworth controlled E-Slate, directly or indirectly, and he did not act in good faith and knowingly induced, directly or indirectly, the acts and/or omissions alleged herein.   Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Allensworth is liable for E-Slate's violations of Section 4b(a)(1)(A)-(C) of the Act.

53.     Allensworth acted within the course and scope of his employment, agency, or office with E-Slate.   Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), E-Slate is liable as principal for Allensworth's violations of Section 4b(a)(1)(A)-(C) of the Act.

54.     Each act of fraudulent solicitation, misappropriation, and false statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(1)(A)-(C) of the Act.

## COUNT II—AGAINST ALL DEFENDANTS

## FRAUD BY A COMMODITY POOL OPERATOR AND AN ASSOCIATED PERSON OF A COMMODITY POOL OPERATOR

### Violations of Section 4o(1)(A) and (B) of the Act

55.     The allegations in paragraphs 1-54 are re-alleged and incorporated herein by reference.

56.     Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A), (B) (2012), make it unlawful for a CPO or AP of a CPO to use

the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client

1          or participant or prospective client or participant.

2         57.   As alleged herein, during the Relevant Period, Weddle and Fusco acted as

3 CPOs (Weddle for the JustInfo Pool and Fusco for the DTG Pool) by soliciting,

4 accepting, or receiving funds from the public while engaged in a business that is of the

5 nature of an investment trust, syndicate, or similar form of enterprise, for the purpose

6 of, among other things, trading in commodity futures contracts.

7         58.   As alleged herein, during the Relevant Period, Allensworth acted as an

8 AP of the CPOs because he solicited and accepted funds, securities, or property from

9 pool participants for Weddle and Fusco for participation in commodity pools.

10         59.   As described above, Weddle and Fusco, while acting as CPOs, and

11 Allensworth, while acting as an AP of the CPOs, through their use of the mails or any

12 means or instrumentality of interstate commerce violated Section 4$o$(1)(A) and (B) of

13 the Act by, among other things:  (i) fraudulently soliciting pool participants and

14 prospective pool participants by making material misrepresentations and omissions

15 about Defendants' commodity futures trading strategy, Defendants' trading abilities

16 and profits, and Defendants' use of deposited funds; (ii) misappropriating pool

17 participants' funds; and (iii) fabricating false records in the form of fake pool

18 performance statements and fake individual account statements.

19         60.   Through the conduct described above, Weddle, Fusco, and Allensworth

20 employed a device, scheme, or artifice to defraud any client or participant or

21 prospective client or participant.

22         61.   Weddle, Fusco, and Allensworth engaged in the transactions, practices, or

23 courses of business described above, which operated as a fraud or deceit upon any

24 client or participant or prospective client or participant.

25         62.   Allensworth acted within the course and scope of his employment,

26 agency, or office with E-Slate.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §

27 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), E-Slate is liable as

28 principal for Allensworth's violations of Section 4$o$(1)(A) and (B) of the Act.

63.     Each act of fraudulent solicitation, misappropriation, and false statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1)(A) and (B) of the Act.

## COUNT III—AGAINST FUSCO AND WEDDLE

## PROHIBITED ACTIVITIES BY A COMMODITY POOL OPERATOR

### Violations of Regulation 4.20(b) and (c)

64.     The allegations in paragraphs 1-63 are re-alleged and incorporated herein by reference.

65.     Regulation 4.20(b), 17 C.F.R. § 4.20(b) (2017), prohibits CPOs, whether registered or not, from receiving pool participants' funds in any name other than that of the pool.

66.     Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2017), prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

67.     As set forth above, during the Relevant Period, Fusco and Weddle, acted as CPOs by soliciting, accepting, or receiving funds from the public while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in commodity futures contracts.

68.     During the Relevant Period, Fusco and Weddle, while acting as CPOs, violated Regulation 4.20(b) and (c) by (1) receiving, funds, securities, or other property from existing or prospective pool participants for the purchase of an interest in the pools without receiving the same in the name of a commodity pool; and (2) failing to maintain separation between their funds and pool funds, by commingling pool funds with their personal funds, and by placing pool funds into their personal bank and trading accounts.

69.     Each act of improperly receiving pool participants' funds and

commingling the property of the DTG and JustInfo Pools with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Regulation 4.20(b) and (c).

**COUNT IV—AGAINST FUSCO AND WEDDLE**

**FAILURE TO REGISTER AS COMMODITY POOL OPERATORS**

**Violations of Sections 4m(1) of the Act**

70.    The allegations in paragraphs 1-69 are re-alleged and incorporated herein by reference.

71.    Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012), makes it unlawful for any CPO, unless registered with the Commission, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

72.    As set forth above, during the Relevant Period, Fusco and Weddle acted as CPOs by soliciting, accepting, or receiving funds from the public while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in commodity futures contracts.

73.    In connection with the acts and practices described above, Fusco and Weddle used the mails and other means or instrumentalities of interstate commerce, including but not limited to interstate wires for transfer of funds, emails, websites, and other electronic communication devices.

74.    During the Relevant Period, Fusco and Weddle were not exempt from registering as CPOs and therefore violated Section 4m(1) of the Act by failing to do so.

75.    Each use by Fusco and Weddle of the mails or any means or instrumentality of interstate commerce in connection with their business as CPOs without proper registration, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act.

## COUNT V—AGAINST ALL DEFENDANTS

### FAILURE TO REGISTER AS AN ASSOCIATED PERSON
### OF A COMMODITY POOL OPERATOR

**Violation of Section 4k(2) of the Act and Regulation 3.12**

76.     The allegations in paragraphs 1-75 are re-alleged and incorporated herein by reference.

77.     Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2012), requires registration with the Commission for any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool or the supervision of any person or persons so engaged.

78.     Section 4k(2) of the Act also makes it unlawful for any CPO to permit any person not registered with the Commission to become or remain associated with the CPO in any capacity described in the preceding paragraph when the CPO knew or should have known that such person was not registered with the Commission or that such registration had expired, been suspended (and the period of suspension has not expired), or been revoked.

79.     Regulation 3.12, 17 C.F.R. § 3.12 (2017), prohibits any person from being an AP of a CPO unless that person is registered with the Commission as an AP of the sponsoring CPO.

80.     During the Relevant Period, Allensworth, who has never been registered with the Commission in any capacity, acted as an AP of a CPO by soliciting funds, securities, or property for participation in the DTG and JustInfo Pools.

81.     Allensworth violated Section 4k(2) of the Act and Regulation 3.12 by engaging in such activities and failing to register as an AP of a CPO.

82.     Fusco and Weddle violated Section 4k(2) of the Act by permitting

Allensworth to become, and to remain, associated with Fusco and Weddle as APs when they knew, or should have known, that Allensworth was not registered.

83. Allensworth acted within the course and scope of his employment, agency, or office with E-Slate. Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), E-Slate is liable as principal for Allensworth's violations of Section 4k(2) of the Act and Regulation 3.12.

84. Each act by Allensworth of soliciting funds, securities, or property for participation in a commodity pool while being associated with Fusco and Weddle without being registered as an AP of a CPO is alleged as a separate and distinct violation of Section 4k(2) of the Act and Regulation 3.12.

85. Each act by Fusco and Weddle of allowing Allensworth to be associated with them in such a capacity when they knew or should have known that Allensworth was not registered as an AP is alleged as a separate and distinct violation of Section 4k(2) of the Act.

## VII.  RELIEF REQUESTED

The Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.   Enter an order finding that:

1) Fusco and Weddle violated Sections 4b(a)(1)(A)-(C), 4k(2), 4m(1), 4o(1)(A) and (B), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6m(1), 6o(1)(A), (B) (2012) and Regulation 4.20(b) and (c), 17 C.F.R. § 4.20(b), (c) (2017);

2) Allensworth violated Sections 4b(a)(1)(A)-(C), 4k(2), 4o(1)(A) and (B), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6o(1)(A), (B) (2012); and Regulation 3.12, 17 C.F.R. § 3.12 (2017);

3) E-Slate violated Section 4b(a)(1)(A)-(C), 7 U.S.C. § 6b(a)(1)(A)-(C) (2012);

B.   Enter orders of permanent injunction restraining, enjoining, and

18

prohibiting Fusco and Weddle, and any other person or entity in active concert with either, from engaging in conduct in violation of Sections 4b(a)(1)(A)-(C), 4k(2), 4m(1), 4*o*(1)(A) and (B), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6m(1), 6*o*(1)(A), (B) (2012), and Regulation 4.20(b) and (c), 17 C.F.R. § 4.20(b), (c) (2017);

C.     Enter orders of permanent injunction restraining, enjoining, and prohibiting Allensworth and E-Slate, and any other person or entity in active concert with either, from engaging in conduct in violation of 4b(a)(1)(A)-(C), 4k(2), 4*o*(1)(A) and (B), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6*o*(1)(A), (B) (2012), and Regulation 3.12, 17 C.F.R. § 3.12 (2017);

D.     Enter an order of permanent injunction prohibiting Fusco, Weddle, Allensworth, and E-Slate and any other person or entity in active concert with any of them, directly or indirectly:

1)  Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2)  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for accounts held in the name of Fusco, Weddle, Allensworth, or E-Slate or for accounts in which Fusco, Weddle, Allensworth, or E-Slate have a direct or indirect interest;

3)  Having any commodity interests traded on Fusco's, Weddle's, Allensworth's, or E-Slate's behalf;

4)  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6)  Applying for registration or claiming exemption from registration with the CFTC in any capacity and engaging in any activity requiring such

registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017);

E.  Enter an order requiring Fusco, Weddle, Allensworth, and E-Slate, as well as any of their successors, to disgorge to any officer appointed by the Court all benefits received from acts or practices that constitute violations of the Act and Regulations as described herein, including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

F.  Enter an order requiring Fusco, Weddle, Allensworth, and E-Slate, as well as their successors, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Fusco's, Weddle's, Allensworth's, or E-Slate's violations (in the amount of such losses), as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

G.  Enter an order directing Fusco, Weddle, Allensworth, and E-Slate and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Fusco, Weddle, Allensworth, or E-Slate and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations, as described herein;

H.  Enter an order requiring Fusco, Weddle, Allensworth, and E-Slate to pay a civil monetary penalty under the Act, to be assessed by the Court, in amounts of not

1   more than the greater of: (1) $170,472 for each violation of the Act and Regulations; or

2   (2) triple Fusco's, Weddle's, Allensworth's, or E-Slate's monetary gain for each

3   violation of the Act and Regulations;

4        I.      Enter an order requiring Fusco, Weddle, Allensworth, or E-Slate to pay

5   costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

6        J.      Enter an order providing such other and further relief as this Court may

7   deem necessary and appropriate under the circumstances.

8   Dated:  September 26, 2017              Respectfully submitted,

9                                          **COMMODITY FUTURES TRADING**
                                           **COMMISSION**

By: _____

Thomas Simek, *pro hac vice pending*
tsimek@cftc.gov
James M. Humphrey IV, *pro hac vice pending*
jhumphrey@cftc.gov
Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
4900 Main Street, Suite 500
Kansas City, MO  64112
(816) 960-7700

21